**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

MAURICE TURNER,                          :
                                         :
            Petitioner,                  :        Civ. No. 18-17384 (FLW)
                                         :
      v.                                 :
                                         :
WARDEN et al.,                           :        **OPINION**
                                         :
            Respondents.                 :
_____  :

This matter has been opened to the Court by Petitioner Maurice Turner's ("Petitioner" or "Defendant") filing of a habeas petition pursuant to 28 U.S.C. § 2254.  Having reviewed the Petition, Respondent's answer, Petitioner's traverse, and the record, the Court denies the Petition for the reasons stated in this Opinion and also denies a certificate of appealability ("COA").

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Following a ten-day jury trial, defendant Maurice Turner was convicted of first-degree murder, N.J.S.A. 2C:11–3a(1), (2) (count one); first-degree felony murder, N.J.S.A. 2C:11–3a(3) (count two); and first-degree robbery, N.J.S.A. 2C:15–1 (count four).[1] After merging count two with count one, State Court Judge Delehey imposed a sentence of life imprisonment on count one, subject to the eighty-five percent parole ineligibility term required by the No Early Release Act (NERA),[2] and imposed a concurrent twenty-year sentence, subject to NERA, on count four. _See State v. Turner_, No. 04–02–122, 2009 WL 3416031, at *1 (N.J. Super. App. Div. Oct. 8, 2009).

---

[1] Prior to jury deliberations, three counts were dismissed: first-degree robbery, count three; third-degree possession of a weapon for an unlawful purpose, count five; and fourth-degree unlawful possession of a weapon, count six.

[2] N.J.S.A. 2C:43–7.2.

In its decision denying Petitioner's direct appeal, the Appellate Division provided the following factual summary of the evidence introduced at Petitioner's trial:

> In the early morning hours of May 24, 2003, a 9-1-1 dispatcher for the City of Trenton received a call describing an assault in progress. Upon arrival, police entered through the unlocked front door and observed a large blood stain on a wall in the front room and leading up the stairway. On the second floor, officers found a woman, later identified as co-defendant Karla Freeman, seated on a bed, crying and upset, covered in blood and holding a telephone. Freeman directed the officers to the rear of the residence, where they observed blood-soaked clothing on the floor and blood on the walls. In the bathroom, they found a male lying face down in a pool of blood. The male, later identified as William Goldware, was clothed only his underwear. The glass in the bedroom window was shattered and shades covered in blood were protruding through the shattered glass.
>
> Detective Timothy Thomas testified that the bedroom was in a state of disarray, showing signs of a considerable struggle. Thomas recovered two cell phones on the floor, one of which was determined to belong to Freeman. The other was registered to one Kandis Queen, defendant's girlfriend, but was used by defendant and bore a sticker reading "Young Reese."
>
> Observing Freeman, Thomas concluded that her depiction of an unknown intruder forcing his way into the residence did not comport with the evidence at the scene because there was no sign of forced entry and Freeman herself was covered in blood even though she claimed not to have been involved in any way in the incident. Police photographed Freeman's hands after observing two broken fingernails, dried blood on her fingers and palms and a bite mark on her back. Police processed the scene for fingerprints and took samples of blood from numerous locations throughout the house.
>
> Three days after the murder, as part of the investigation, police stopped an Infiniti Q45 driven by Queen, who was wanted on an outstanding arrest warrant. Queen lived with defendant. In an informal statement provided to police, Queen stated she was the owner of the car, as well as the silver cell phone, which she had lent to defendant hours before the murder and which was recovered at the scene. She testified that defendant left their shared apartment at 8:00 p.m. on the night before the murder, taking the Infiniti Q45 and the silver cell phone with him, and did not return for five or six hours.

2

A custodian of records for Sprint–Nextel testified that on the morning of the murder, between approximately 1:30 a.m. and 2:18 a.m., eleven phone calls were exchanged between Goldware and Freeman, and five phone calls were exchanged between Freeman and the cell phone Queen loaned to defendant. The testimony from the Sprint–Nextel representative established that both defendant and Goldware were on the phone with Freeman at the same time on the morning of the murder.

In the early morning hours of May 27, 2003, police executed a search warrant for the apartment Queen and defendant shared, and located a black t-shirt in the back of the closet. Close analysis of the t-shirt showed a blood stain on the back of the shirt near the bottom hem. Later that morning, police arrested defendant and observed lacerations on his arms.

The State produced the testimony of a forensic scientist, who offered expert opinion on the blood stains recovered from defendant's t-shirt, throughout Freeman's home and from the gas pedal of the Infiniti. The expert opined that, to a reasonable degree of scientific certainty, the blood recovered from defendant's t-shirt belonged to Goldware. He also opined that the blood recovered from the gas pedal of the Infiniti driven by defendant likewise belonged to Goldware. Defendant was identified as the source of the blood recovered from the Infiniti steering wheel and dashboard, as well as the blood found on the front door, the top of the stairwell and the bathroom doorknob of the crime scene.

A deputy medical examiner testified that an external examination of Goldware's head and cheek bone showed numerous contusions consistent with a beating, as well as twenty-four stab wounds on his upper extremities, chest, back and armpit. He opined that the stab wounds, particularly to Goldware's lungs and heart, were the cause of his death.

*Turner*, 2009 WL 3416031, at *1–2.

Petitioner appealed his conviction and sentence, and the Appellate Division rejected Petitioner's claims and affirmed his conviction and sentence in an unpublished opinion. *Turner*, 2009 WL 3416031, at *4–5. Defendant's petition for certification was denied. 201 N.J. 446 (2010).

Petitioner subsequently sought postconviction relief ("PCR") and the Appellate Division summarized these proceedings as follows:

3

In October 2010, defendant filed a pro se petition for post-conviction relief (PCR) alleging a laundry list of claims of ineffective assistance of trial and appellate counsel. PCR counsel was assigned and sought production of documents relating to a detective who testified at trial claiming the documents could have been used at trial to impeach the detective. The motion was denied after oral argument.

Before his first PCR petition was decided, defendant submitted a pro se supplemental letter brief raising additional claims of ineffective assistance of trial counsel including, failure to move to suppress data retrieved from cell phones, and failure to move to suppress a black shirt which contained defendant's DNA.

On August 13, 2013, the PCR judge issued an order declining to consider defendant's pro se supplemental brief and denying relief without a hearing on the remaining claims. Defendant filed a notice of appeal on December 12, 2013, which we accepted as filed within time.

While his appeal was pending, defendant filed a second PCR petition attempting to raise the claims he had advanced in his rejected pro se supplemental brief. On July 9, 2014, a different PCR judge filed an order accompanied by a decision denying defendant's second petition as procedurally barred. Defendant now appeals from that order and the order of August 13, 2013.

*State v. Turner*, No. A–1794–13T22017, WL 3902931, at *1 (N.J. Super. App. Div. Sept. 7,

2017).  The Appellate Division affirmed the denial of all issues raised on appeal.  *See id.* at *8.

The New Jersey Supreme Court denied certification.  233 N.J. 307 (2018).

On behalf of Petitioner, counsel submitted a federal habeas petition on December 19,

2018.  *See* ECF No. 1.  Respondents filed their Answer on August 8, 2019, [3] and Petitioner's

---

[3] The Court notes that Respondents failed to comply with the Court's directions in the Order to Answer with respect to the filing of exhibits.  None of the exhibits are identified.  Respondents also do not provide an index of exhibits, and the Answer does not refer to the docket numbers where the exhibits are filed in this action.  The failure to comply with the Order to Answer in this regard made the Court's task extremely difficult, as the Court had to sift through unidentified exhibits to find the relevant documents.  This exercise is clearly a waste of judicial resources. In future habeas cases, Respondents are well-advised that they **must** comply with the Order to Answer in all respects by identifying all exhibits, citing to the exhibits as identified in the Answer, and submitting an index of exhibits.

counsel submitted a traverse on September 18, 2019.  *See* ECF Nos. 15-28.  The matter is fully briefed and ready for disposition.

## II.     **STANDARD OF REVIEW**

Section 2254(a) permits a court to entertain only claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioner has the burden of establishing each claim in the petition.  *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013). Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, Pub. L. No. 104-132, tit. I, § 101 (1996), 28 U.S.C. § 2244, federal courts in habeas corpus cases must give considerable deference to determinations of state trial and appellate courts.  *See Renico v. Lett*, 599 U.S. 766, 772 (2010).

Section 2254(d) sets the standard for granting or denying a writ of habeas corpus:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Where a state court adjudicated a petitioner's federal claim on the merits,[4] a federal court "has no authority to issue the writ of habeas corpus unless the [state c]ourt's decision 'was

---

[4] "For the purposes of Section 2254(d), a claim has been 'adjudicated on the merits in State court proceedings' when a state court has made a decision that (1) finally resolves the claim, and (2)

contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Parker v. Matthews*, 567 U.S. 37, 40-41 (2012) (quoting 28 U.S.C. § 2254(d)).

"[C]learly established law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of t[he Supreme Court's] decisions," at of the time of the relevant state-court decision. *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).  A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d) (1) if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." *Williams*, 529 U.S. at 405-06.  Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. As to 28 U.S.C. § 2254(d)(1), a federal court must confine its examination to evidence in the record.  *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

Where a petitioner seeks habeas relief, pursuant to § 2254(d)(2), on the basis of an erroneous factual determination of the state court, two provisions of the AEDPA necessarily apply. First, the AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  29 U.S.C. § 2254(e)(1); *see*

---

resolves th[at] claim on the basis of its substance, rather than on a procedural, or other, ground." *Shotts v. Wetzel*, 724 F.3d 364, 375 (3d Cir. 2013) (citation and internal quotation marks omitted).

*Miller–El v. Dretke*, 545 U.S. 231, 240 (2005).  Second, the AEDPA precludes habeas relief unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

A petition for a writ of habeas corpus "shall not be granted unless ... the applicant has exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1); *Wilkerson v. Superintendent Fayette SCI*, 871 F.3d 221, 227 (3d Cir. 2017).  This Court may, however, deny petitioner's unexhausted claim on the merits. 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

### III.   <u>ANALYSIS</u>

#### a.  **Violation of the Confrontation Clause (Ground One)**

In Ground One of the Petition, Petitioner contends that his conviction was obtained in violation of the Confrontation Clause and *Douglas v. Alabama*, 380 U.S. 415 (1965), based on the improper trial testimony of Detective Timothy Thomas.  Petitioner claims that Thomas's testimony violated his right to confrontation by tracking and referencing Karla Freeman's statements implicating Petitioner.

Freeman's conflicting statements to Detective Timothy Thomas are set out in detail in *State v. Freeman*, No. 04-02-0122, 2010 WL 3611979, at *3-4 (N.J. Super. App. Div. Sept. 10, 2010).  In a nutshell, Freeman initially told Detective Thomas an unknown intruder came in the house and attacked Goldware; upon further questioning about her involvement, Freeman confessed she had a sex for money arrangement with Goldware and stabbed him during a fight after Goldware demanded sex but refused to pay for it.  *See id.* at *2-3.  As Thomas was

compiling her statement, Freeman said: "Detective, that's not what happened. Me and Maurice

set him up to rob him, and Maurice stabbed him." When Thomas asked if she was sure, she

replied "No, no, that's not what happened.... I killed him." *Id.* at *3.

Upon meeting Detective Thomas again, Freeman provided a detailed taped statement

claiming that she and Petitioner set up Goldware to rob him and that she did not know that

Petitioner planned to stab Goldware:

> After [Freeman] left Black Jack's, she asked Turner for a ride
> home. She declined Turner's offer to go to an after-hours bar,
> stating that she "got some money coming to my house." After
> hearing this, Turner told [Freeman] to leave her door open so that
> he could enter and rob Goldware. [Freeman] stated:
>
> > [Reese][5] was saying he was going to hit [Goldware]
> > in his head and go in his pockets and leave. So me
> > and [Reese] got to my house. I went upstairs, and I
> > asked [Reese] how he was going to rob [Goldware].
> > [Reese] said just have the lights out and I'm going
> > to wrap something around my mouth. [Reese] said
> > he was going to knock him off of the bed and go
> > into his pockets and take his money. But I didn't
> > think that he had guns or knives. So I just figured it
> > was going to be just like he said it was going to be,
> > just knock him off the bed, take his money and run.
> > [Reese] said after he got the money, it would be half
> > and half. Reese left and told me to call him when
> > the boy came.
>
> [Freeman] then told Thomas that after Goldware arrived, she left
> the door open so that Turner could enter. [Freeman] heard Turner
> as he entered the house and climbed the stairs, so she distracted
> Goldware by kissing him. When Turner arrived in the bedroom, he
> pushed [Freeman] and Goldware to the floor and began asking
> "where it's at?" Turner then stabbed Goldware "three or four
> times." [Freeman] and Goldware escaped to the bathroom, but
> Turner followed them. When Turner finally fled the scene,
> [Freeman] first dialed her grandmother's telephone number before
> calling 911.
>
> When Thomas asked [Freeman] why she had given the earlier,
> contradictory versions of the events, she stated, "[b]ecause I was

---

[5] As noted in the factual recitation, "Reese" is Turner's nickname.

> terrified, and I knew I had part in robbing [Goldware], but I did not
> know [Turner] was going to stab [Goldware]." She further stated
> that she had confessed to stabbing Goldware herself in an earlier
> statement because she felt that if she had not left her door open,
> Goldware would have never been stabbed, and she was also
> worried about her cousin, Kandis Queen, who had a child with
> Turner. When asked why this statement was more reliable than her
> previous statements, [Freeman] said, "[b]ecause I'm willing to take
> my punishment, but I'm not willing to pay for somebody else
> murdering. Also, this is the truth about what happened."

*Freeman*, 2010 WL 3611979, at *3–4; *see also* ECF No. 24, Freeman Statements dated May 25,

2003 and May 24, 2003.

In her statement implicating Petitioner, Freeman also stated that after she and Goldware

fled to the bathroom, "Maurice was pulling the door toward him and [Freeman] was pulling the

door toward [her].  That's when Reese busted the bathroom door window out and [Goldware]

busted the bathroom door window out."  *See* Freeman's May 25, 2003 Statement at 3.

In its opinion denying Petitioner's direct appeal, the Appellate Division summarized

Thomas's challenged testimony as follows:

> The State did not call [Karla Freeman] as a witness at trial, and
> consequently the taped statements she had provided to police
> implicating defendant were not presented to the jury. During
> Thomas's testimony, he was asked on cross-examination why he
> did not believe Goldware had been involved in a struggle in the
> bathroom of Freeman's home, to which Thomas replied:
>
>> [THOMAS:] I believe the struggle, most of the
>> struggle happened in that back part of the bedroom
>> area, because of the blood, the damage to the walls
>> and the cell phone recovery and the ironing board.
>>
>> [THE DEFENSE:] And that certainly explains why
>> there was blood throughout the entire bathroom, is
>> that correct?
>>
>> [THOMAS:] That's where he went into. He closed
>> the door and started bleeding, and [defendant] was
>> trying to get in. He kept bleeding. [Defendant] was
>> trying to get in, and that's where he lost most of his
>> blood.

> [THE DEFENSE:] That's your theory, huh?
>
> [THOMAS:] That's the information I have, yes.
>
> [ (Emphasis added).]

Defendant did not object to the "that's-the-information-I-have" remark.

The next day, defendant moved for a mistrial, arguing that Thomas's testimony was taken "almost verbatim" from the statements Freeman provided to police. Judge Delehey denied the motion, reasoning that because the defense asked Thomas for "his theory about what happened," defendant had essentially opened the door to the complained-of testimony. The judge also concluded there was no prejudice because the jury was unaware that Thomas's testimony conformed to one of Freeman's statements. Finally, the judge ruled that there was sufficient scientific evidence in the record to support Thomas's theory.

*Turner*, 2009 WL 3416031, at *2-3.

The Appellate Division then rejected Petitioner's claim that Thomas's testimony violated

Petitioner's right of confrontation as follows:

In Point I, defendant asserts that portions of Thomas's testimony incorporated inculpatory portions of Freeman's statements, thereby presenting hearsay evidence to the jury and violating his Sixth Amendment right of confrontation. In particular, defendant maintains that Thomas's theory of the case was taken "almost verbatim from the statement of Freeman" and that the answer "that's the information I have" suggested to the jury that Thomas was relying on a statement provided by Freeman implicating defendant in the murder of Goldware. As support for his contention that Freeman's testimony caused the jury to infer that Thomas had access to additional information due to his having taken Freeman's statements, defendant points to a jury note that requested Freeman's statement, a request the jury withdrew before the judge or the parties could address it.

Hearsay is "a statement, other than one made by the declarant while testifying ..., offered in evidence to prove the truth of the matter asserted." N.J.R.E. 801(c). Furthermore, "'[w]hen the logical implication to be drawn from the testimony leads the jury to believe that a non-testifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay.'" *State v. Branch*, 182 N.J. 338, 349, 865 A.2d 673 (2005) (quoting *State v. Bankston*, 63 N.J. 263, 271, 307 A.2d 65 (1973)).

Here, neither defendant nor Thomas specified that Thomas's testimony was derived from Freeman's statements given to police. Rather, the entire exchange shows that the defense asked Thomas why he did not believe there was a struggle in the bathroom, then allowed Thomas to explain his reasoning. Thomas did so first by referring to his personal observations and then by giving his "theory of the case," as solicited by the defense, as to what happened in the bathroom, without ever referring to the statement of Freeman. The logical implication to be drawn from Thomas's testimony was that "the information" he had was based on his own physical observations of the scene. Thus, it did not run afoul of the rule announced in *Branch*, *supra*, 182 N.J. at 349, 865 A.2d 673, because the statement did not qualify as hearsay, and therefore did not violate defendant's Sixth Amendment right of confrontation.

While we are aware of the jury's note that referred to Freeman's statement, it would be sheer speculation to conclude that the jury asked for Freeman's statement because it believed Thomas's comment, "that's the information I have," was a reference to information he had gleaned from Freeman. Therefore, defendant's claim—that the jury's request for Freeman's statement establishes the jury believed Thomas's testimony was based upon Freeman's hearsay statement—is meritless.

*Turner*, 2009 WL 3416031, at *5–6.

The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee a criminal defendant the right to confront "the witnesses against him." U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10.  The right of confrontation is an essential attribute of the right to a fair trial, requiring that a defendant have a "'fair opportunity to defend against the State's accusations.'"  *State v. Garron*, 177 N.J. 147, 169, 827 A.2d 243, 256 (2003) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973)).  In *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004), the Supreme Court held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was

unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *See also Davis v. Washington*, 547 U.S. 813, 821 (2006).[6]

The Appellate Division relied on *State v. Branch*, 182 N.J. 338, 349 (2005) in rejecting Petitioner's claim that Thomas's testimony violated the Confrontation Clause.  In *Branch*, the New Jersey Supreme Court reiterated its prior holding that the Confrontation Clause is violated when a police detective's testimony "leads to 'the 'inescapable inference' that the detective received information from an unknown source implicating the defendant in the crime." (citing *State v. Bankston*, 63 N.J. 263, 268-69 (1973)); *see id.* at 350 ("both the Confrontation Clause and the hearsay rule are violated when, at trial, a police officer conveys, directly or by inference, information from a non-testifying declarant to incriminate the defendant in the crime charged.")

The Confrontation Clause is commonly implicated when a witness refers to specific information from a non-testifying third party.  In *Branch*, the State's case against the defendant rested primarily on the identification of the defendant by two victims. 182 N.J. at 346–47.  A detective testified that he assembled a photo array based on information received.  *Id.* at 347. The Court determined that the reference to "information received" contravened the defendant's Sixth Amendment right to confront witnesses with incriminating evidence, because the *reasons* the detective included a photo in an array are not relevant to the identification process, and  in

---

[6] As explained in *Davis v. Washington*, "[i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."  547 U.S. at 821.  In the context of police interrogations, "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822.  To the extent Freeman's statements implicating Petitioner were introduced at trial, they would be testimonial; however, as explained below, no such statements were introduced during Thomas's testimony.

providing that information to the jury, the officer improperly conveyed that he possessed information unknown to them but highly relevant to the investigation.  *Id.* at 352–53; *accord State v. Bankston*, 63 N.J. at 268–69 (holding that detective's recounting of information received from informant to explain reason for entry to tavern and arrest of defendant contravened defendant's Sixth Amendment right to confront witnesses against him).  The "common thread" that renders testimony about information received from non-testifying third parties inadmissible "is that a police officer may not imply to the jury that he possesses superior knowledge, outside the record, that incriminates the defendant." *Branch*, 182 N.J. at 351.

It is notable that the testimony at issue in this case involved a purported statement by a participant in the crime itself.  In prosecutions where there are multiple participants in a crime, the Confrontation Clause's "truth finding function is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination." *Lee v. Illinois*, 476 U.S. 530, 541 (1986)).  Thus, in *Bruton v. United States*, the United States Supreme Court held that a defendant's confrontation right was violated by the admission of his co-defendant's incriminatory confession, even if curative jury instructions were later given. 391 U.S. 123, 126, (1968).

In this vein, Petitioner contends that his conviction violates *Douglas v. Alabama*, 380 U.S. 415 (1965).  The facts and holding of *Douglas* are succinctly summarized by the Supreme Court in *Lee v. Illinois*:

> Thus, in *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 434 (1965), we reversed a conviction because a confession purportedly made by the defendant's accomplice was read to the jury by the prosecutor. Because the accomplice in that case, while called to the witness stand, invoked his privilege against self-incrimination and refused to answer questions put to him, we held that the defendant's "inability to cross-examine [the accomplice] as to the alleged confession plainly denied him the right of cross-

> examination secured by the Confrontation Clause." *Id.*, at 419, 85
> S.Ct., at 1077. This holding, on which the Court was unanimously
> agreed, was premised on the basic understanding that when one
> person accuses another of a crime under circumstances in which
> the declarant stands to gain by inculpating another, the accusation
> is presumptively suspect and must be subjected to the scrutiny of
> cross-examination.

*See* 476 U.S. at 541. *Douglas*, *Bruton*, and *Lee* are distinguishable from the present case,

because in those cases, the accomplice's or codefendant's statements implicating the defendant

were explicitly read to the jury.   In contrast, Freeman's statement, here, implicating Petitioner

was not read to the jury or mentioned by Thomas.  Moreover, as explained by the Appellate

Division, Thomas's statement "That's the information I have" does not lead to the "inescapable

inference" that Thomas's theory of the case was garnered from Freeman's statement rather than

from the physical evidence at the scene, i.e., the evidence of a struggle in the bedroom, the

amount of blood in the bathroom, and Petitioner's DNA on the bathroom doorknob.  And to the

extent that phrase alluded to information from another source, that reference is too vague to

support relief under federal precedent.  The fact that Thomas's invited testimony tracks

Freeman's statement implicating Petitioner is likewise irrelevant because Thomas did not

mention Freeman or her statement implicating Petitioner to the jury during his testimony.

Petitioner's argument that the jury asked for Freeman's statement due to Thomas's testimony is

speculative at best.

Because the Appellate Division did not unreasonably apply clearly established federal

law in rejecting Plaintiff's claim that Thomas's testimony violated the Confrontation Clause and

because Thomas's testimony did not violate *Douglas* and its progeny, the Court denies relief on

ground One.

### b.  Ineffective Assistance of Counsel (Ground Two)

In Ground Two of the Petition, Petitioner contends that his trial counsel provided ineffective assistance of counsel.  Ground Two has four subparts:

a.)  Counsel provided inaccurate advice about Petitioner's sentencing exposure and had his counsel told him he could have received <u>more than</u> a sentence of 30 to Life, he would have taken a plea deal and not gone to trial;

b.)  Counsel was ineffective for failing to object to the prosecutor's summation, which included facts not in evidence and facts obtained in violation of the Confrontation Clause;

c.)  Counsel was ineffective for failing to file a motion to suppress the cell phone, the cell phone number, and all evidence obtained from the search of the cell phone; and

d.)  Counsel was ineffective for failing to call the court's attention to a sleeping juror.

To succeed on an ineffective assistance of counsel claim, petitioner must establish that: (1) counsel's performance was deficient; and (2) this inadequate representation "prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Williams v. Taylor*, 529 U.S. 362, 390-1 (2000).  To establish ineffective assistance of counsel "a defendant must show both deficient performance by counsel and prejudice." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009).  The Supreme Court instructs that a court need not address both components of an ineffective assistance claim "if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*

To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (citing *Strickland*, 466 U.S. at 688).  A court considering a

claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.* (citing *Strickland*, 466 U.S. at 689). The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Harrington* 562 U.S. at 687. "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" and focuses on "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105.

With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (citing *Strickland*, 466 U.S. at 694). It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* (citing *Strickland*, 466 U.S. at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* (citing *Strickland*, 466 U.S. at 687).

### 1. Ineffective Assistance Regarding Sentencing Exposure

Defendant first claims that his trial counsel failed to correctly advise him as to his sentencing exposure and assert that had he known he risked a sentence of life imprisonment <u>subject to NERA</u>, he would have accepted a favorable plea deal. As noted above, Petitioner was convicted of first-degree murder, N.J.S.A. 2C:11–3a(1), (2) (count one); first-degree felony murder, N.J.S.A. 2C:11–3a(3) (count two); and first-degree robbery, N.J.S.A. 2C:15–1 (count four). After merging count two with count one, Judge Delehey imposed a sentence of life

imprisonment on count one, subject to the eighty-five percent parole ineligibility term required

by the No Early Release Act (NERA), and imposed a concurrent twenty-year sentence, subject to

NERA, on count four.  *See Turner*, 2009 WL 3416031, at *1.

       The Appellate Division rejected this claim as follows:

> The PCR judge noted defendant acknowledged his trial counsel
> had informed him of his exposure of thirty years to life in prison
> and concluded that defendant had failed to establish a prima facie
> case for ineffective assistance warranting either an evidentiary
> hearing or any substantive relief. We agree.
>
> Defendant's acknowledgment that he was advised his exposure
> could extend to life in prison completely undermines his claim that
> he was misinformed by trial counsel.

*Turner*, 2017 WL 3902931, at *3.

       The Court has reviewed Petitioner's certification regarding his understanding of his

sentencing exposure, *see* ECF No. 21-9, and finds that the Appellate Division's determination

was not an unreasonable determination of the facts or an unreasonable application of *Strickland*.

Defendants have a constitutional right to effective assistance of counsel during plea negotiations.

*Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985). As explained in *United States v. Day*, 969 F.2d 39,

43 (3d Cir. 1992), "[k]nowledge of the comparative exposure between standing trial and

accepting a plea offer will often be crucial to the decision whether to plead guilty."  *Id*.  The nub

of the prejudice inquiry is whether the attorney's deficient performance leaves the defendant

worse off.

       As explained in *Lafler v. Cooper*, 566 U.S. 156 (2012), where a defendant claims that his

attorney's ineffective advice caused him to go to trial instead of accepting a plea offer, he must

show that but for the ineffective advice of counsel there is a reasonable probability that the plea

offer would have been presented to the court (*i.e.*, that the defendant would have accepted the

plea and the prosecution would not have withdrawn it in light of intervening circumstances), that

the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

Here, the Appellate Division did not unreasonably apply *Strickland* in the plea context when it determined that Petitioner's claim was undermined by the fact that Petitioner's counsel advised him he faced the possibility of life imprisonment. As the Appellate Division reasoned, counsel told Petitioner that his sentence could range from 30 years to life imprisonment. If Petitioner would go to trial knowing he faced life imprisonment, he would not have accepted a plea deal had he known that he would need to serve 85% of whatever sentence the Trial Judge imposed. The Appellate Division's reading of Petitioner's contradictory certification, and its conclusion that Petitioner failed to make out a prima facie case of ineffective assistance are not unreasonable. As such, the Court denies relief this aspect of Ground two.

Moreover, it is notable that Petitioner's certification does not include the other essential elements of a *Lafler* claim, *i.e.*, that there was a reasonable probability that there was a specific plea deal that would have been presented to the Court, that the government would not have withdrawn the plea, and the Court would have accepted the plea. *See* ECF No. 21-9, Turner Certification dated July 19, 2013. Indeed, there are no facts about whether a specific plea deal was offered to Petitioner, and Petitioner's vague allegation that the "state's offer" was "substantially lower" than the sentence he received is at best conclusory in his Petition, which is not sufficient meet his burden. As such, the claim fails on this basis as well.

### 2. Failure to objection to Prosecutor's Summation

Petitioner also argues in Ground Two that trial counsel was ineffective for failing to object to the prosecutor's summation which was based on facts not in evidence, and facts introduced in violation of the Confrontation Clause.

Petitioner first challenged the prosecutor's comments in summation on direct appeal. The Appellate Division summarized the comments as follows:

> In summation, among other arguments, the State maintained that defendant's blood was found on the doorknob of the bathroom because defendant was injured in the struggle, and that his blood was on the doorknob because he tried to prevent Goldware from leaving. The prosecutor argued, "[a]n injured [defendant] tries to open the door or he tries to hold the door shut preventing ... Goldware from leaving. Either way it still explains how his DNA gets on the exterior doorknob. He proceeds to finish off Goldware with Freeman in whatever form."

> In the course of his closing, the prosecutor commented that he had "been living with this case for a number of years.... [A]nd ... [had] been looking at these [phone] records for a long time...." The prosecutor continued by explaining that a detective looked at the records, and upon first glance realized that Freeman was on her cell phone with Goldware and her landline with defendant at the same time, 2:10 a.m.

> The State's closing also presented an explanation of why the t-shirt with Goldware's blood was still in defendant's closet and had not been discarded. The prosecutor stated, "[t]he reason that shirt was still in there, in [defendant]'s closet, as opposed to all the other bloody clothes that he had on that night, which I'll prove to you, is because it is a black shirt and it's [,] [the blood stain,] in a weird spot." There was no objection to any of these three comments.

*Turner*, 2009 WL 3416031, at *3.  The Appellate Division then rejected the prosecutorial misconduct claims as to all three comments:

> The final argument defendant presents in Point I concerns the three portions of the prosecutor's summation that we have already described. Defendant asserts that those arguments exacerbated the harmful effect of Thomas's testimony, and constituted prosecutorial misconduct. As we have observed, defendant did not object to any of the three comments in the prosecutor's summation. We therefore evaluate them under the plain error standard, and will

disregard any such error unless it was "clearly capable of producing an unjust result." R. 2:10–2.

"[A] prosecutor is afforded considerable leeway to make forceful arguments in summation." Prosecutors may " 'strike hard blows ... [but not] foul ones.' " *State v. Echols*, 199 N.J. 344, 359, 972 A.2d 1091 (2009) (quoting *State v. Wakefield*, 190 N.J. 397, 436, 921 A.2d 954 (2007)). However, the Court has cautioned that " 'the primary duty of a prosecutor is not to obtain convictions, but to see that justice is done.'" *State v. Frost*, 158 N.J. 76, 83, 727 A.2d 1 (1999) (quoting *State v. Ramseur*, 106 N.J. 123, 320, 524 A.2d 188 (1987)). It is as much a prosecutor's duty to avoid using improper methods to produce a wrongful conviction as it is to use legitimate methods to bring about a just one. *Ibid.* Therefore, a prosecutor should " 'confine [his or her] comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence.'" *State v. Bradshaw*, 195 N.J. 493, 510, 950 A.2d 889 (2008) (quoting *State v. Smith*, 167 N.J. 158, 178, 770 A.2d 255 (2001)). "[P]rosecutorial misconduct can be a ground for reversal where the prosecutor's misconduct was so egregious that it deprived the defendant of a fair trial." *Frost*, *supra*, 158 N.J. at 83, 727 A.2d 1.

We now turn to the three portions of the State's summation defendant claims are instances of prosecutorial misconduct that require reversal of his conviction. We view the first portion, in which the prosecutor argued that defendant's DNA was found on the outside knob of the bathroom door because he was trying to open it to injure Goldware or attempting to hold it shut to prevent Goldware from leaving, as an entirely proper inference reasonably drawn from the State's DNA evidence.

Likewise, the second portion of the prosecutor's summation, in which the prosecutor commented that he had not drawn conclusions about Freeman's use of her cell phone and landline by himself, but had instead availed himself of a detective's expertise, was a benign argument fully supported by the cell phone record testimony that the State introduced at trial.

As to the prosecutor's comment about the blood stain on the back of defendant's t-shirt, the prosecutor's argument that the blood stain was in a "weird spot" was nothing more than a reasonable explanation of why the black t-shirt was the only item of defendant's clothing stained with Goldware's blood that police were able to find.

None of these remarks, either individually or in the aggregate, come remotely close to satisfying the *Frost* standard of comments "so egregious" as to "deprive[ ] the defendant of a fair trial" *Frost*,

> *supra*, 158 N.J. at 83, 727 A.2d 1. We thus reject all of the
> arguments defendant advances in Point I.

*Turner*, 2009 WL 3416031, at *6–7.  The Appellate Division also rejected Petitioner's argument

on direct appeal that the prosecutor engaged in prosecutorial misconduct when he incorporated

testimony from Thomas in his summation:

> Defendant's remaining arguments in Point II, that the prosecutor
> engaged in prosecutorial misconduct when he incorporated such
> testimony from Thomas in his closing, referred to it as evidence,
> and thereby usurped the function of the jury, warrants no
> discussion. R. 2:11–3(e)(2). Suffice it to say, the prosecutor's
> arguments were confined to the evidence that was fairly presented
> to the jury, and there was consequently no basis for the judge to
> have sua sponte directed the jury to disregard those portions of the
> prosecutor's summation.

*Turner*, 2009 WL 3416031, at *8.

Petitioner also asserted on direct appeal that his counsel provided ineffective assistance of

counsel when he failed to file a motion for a new trial, in light of the admission of hearsay and

opinion testimony of witnesses and the prosecutor's comments in summation:

> Relying on "the improper admission of the hearsay and opinion
> testimony of the [S]tate's witness" and the prosecutor's comments
> in summation, defendant argues in Point IV that trial counsel
> provided ineffective assistance of counsel when he failed to move
> for a new trial. Because such omission amounted to what
> defendant characterizes as a miscarriage of justice, defendant asks
> us to disregard Rule 2:10–1 and exercise original jurisdiction to
> resolve this matter. Pursuant to Rule 2:10–1, "the issue of whether
> a jury verdict was against the weight of the evidence shall not be
> cognizable on appeal unless a motion for a new trial on that ground
> was made in the trial court." As no such motion was made by trial
> counsel, defendant is procedurally barred from arguing on appeal
> that the verdict was against the weight of the evidence.
>
> Rather than defer defendant's ineffective assistance of counsel
> claim to the post-conviction relief process, *see State v. Precose*,
> 129 N.J. 451, 609 A.2d 1280 (1992), we exercise our discretion to
> consider this claim now. To demonstrate ineffective assistance of
> counsel, defendant must show that counsel's performance was
> deficient and that this deficient performance prejudiced his

defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L. Ed.2d 674, 693 (1984).

Defendant cannot meet this burden because he has not satisfied either of the *Strickland* prongs. In light of the presumption that counsel acted reasonably[7] and the strength of the State's evidence, defendant has not shown that counsel's performance was in any way deficient, or, even if deficient, that such deficiency prejudiced him. In particular, the State's proofs established that: defendant's blood was found at the scene, and defendant had fresh injuries and scratches that would explain the presence of his blood; a cell phone used by defendant was recovered at the scene; telephone records matched calls from that cell phone to Freeman shortly before Goldware was murdered; and Goldware's blood was found not only on defendant's t-shirt but also on the gas pedal of the car defendant was driving. We agree with the trial judge's conclusion that there was "overwhelming evidence" of defendant's participation in the crime.

Moreover, as we have discussed, the portions of the trial to which defendant points as reversible error were not error, much less reversible error. Consequently, when the overwhelming proof of defendant's guilt is considered in light of this record, we conclude that there would have been no legitimate basis upon which trial counsel could have sought a new trial. Thus, his failure to do so does not constitute ineffective assistance. There can be no more telling resolution of this issue than the trial judge's comment at sentencing that had such motion been filed, "the court would deny that motion." We thus reject the ineffective assistance of counsel claim defendant has advanced in Point IV.[8]

*Turner*, 2009 WL 3416031, at *10–11.

Finally, in Point III of his PCR petition, Petitioner argued that his counsel provided ineffective assistance by failing to object to portions of the prosecutor's summation. *See* PCR Opinion at 13-16. The PCR court rejected these claims as meritless and procedurally barred because they were raised and adjudicated on direct appeal. *See id.* at 16 ("Accordingly, this court dismisses Petitioner's claim as procedurally barred. R. 3:22-5."). It appears, however, that

---

[7] "*See Strickland*, *supra*, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L. Ed.2d at 694."

[8] The Appellate Division noted in a footnote: "We do not foreclose defendant's right to advance other ineffective assistance of counsel claims in any future post-conviction relief proceeding."

Petitioner did not reraise this claim to the Appellate Division on appeal of the denial of his PCR petitions.

The Supreme Court has held that federal habeas relief may be granted when the "prosecutorial misconduct may 'so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The Court further opined that for due process to have been offended, "the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Id.* (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985) (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976))). *See also Ramseur v. Beyer*, 983 F.2d 1215, 1239 (3d Cir.1992) (our review of a prosecutor's conduct in a state trial in a federal habeas proceeding is limited to determining whether the prosecutor's conduct "'so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process.'" (quoting *Greer*, 483 U.S. at 765)). This determination will, at times, require us to draw a fine line-distinguishing between ordinary trial error on one hand, and "'that sort of egregious misconduct which amounts to a denial of constitutional due process'" on the other hand. *Ramseur*, 983 F.2d at 1239 (quoting *United States ex rel. Perry v. Mulligan*, 544 F.2d 674, 678 (3d Cir.1976)); *see also Werts v. Vaughn*, 228 F.3d 178, 197–98 (3d Cir. 2000).

The Court has reviewed the prosecutor's summation, including the comments referenced in Plaintiff's direct appeal and his PCR. The Appellate Division did not unreasonably apply clearly established federal law in rejecting Petitioner's direct appeal claims of prosecutorial misconduct or his ineffective assistance claims regarding the denial of a new trial based, in part, on the prosecutor's comments in summation. And Petitioner's allegations that his counsel failed to object to the prosecutor's comments in summation similarly fail because Petitioner can neither

show deficient performance or prejudice arising from his attorney's failure to object to the prosecutor's comments in summation. As the Appellate Division determined on direct appeal, these comments were based on the evidence and not improper. Had his attorney objected to these comments, the trial court would not have sustained those objections. As such, relief on Petitioner's claims in Ground Two arising from the prosecutor's comments in summation are denied.

### 3. Failure to Move to Suppress Cell Phone Evidence

Petitioner next asserts that trial counsel was ineffective for failing to file a motion to suppress the cell phone, the cell phone number, and all evidence obtained from the search of the cell phone. This issue was raised in Petitioner's second PCR and was rejected by the Appellate Division as follows:

> Defendant argues that his second PCR petition, which raised various claims of ineffective assistance of trial and appellate counsel should not have been procedurally barred. The PCR judge found the claims barred by Rule 3:22–4(b). The Rule provides:
>
> A second or subsequent petition for post-conviction relief shall be dismissed unless:
>
> (1) it is timely under R. 3:22–12(a)(2); and
>
> (2) it alleges on its face either:
>
> (A) that the petition relies on a new rule of constitutional law, made retroactive to defendant's petition by the United States Supreme Court or the Supreme Court of New Jersey, that was unavailable during the pendency of any prior proceedings; or
>
> (B) that the factual predicate for the relief sought could not have been discovered earlier through the exercise of reasonable diligence, and the facts underlying the ground for relief, if proven and viewed in light of the evidence as a whole, would raise a reasonable probability that the relief sought would be granted; or
>
> (C) that the petition alleges a prima facie case of ineffective assistance of counsel that represented the defendant on the first or subsequent application for post-conviction relief.
>
> [R. 3:22–4(b).]

> The claims raised by defendant in his second PCR petition alleging ineffective assistance of trial and appellate counsel do not fall into any of the three narrow categories permitting relief. Even if we were to consider his claims, they lack merit.
>
> Defendant presented two arguments: (1) trial counsel should have moved to suppress the cell phones recovered at the scene of the murder and a shirt bearing defendant's DNA recovered from his residence; and (2) trial counsel should have moved for dismissal on double jeopardy grounds after the mistrial, and appellate counsel should have raised that issue on appeal.
>
> The record clearly establishes that search warrants were obtained for both the murder scene and defendant's residence. Defendant's claim that items were seized before the warrants were actually obtained is not supported by the record.

*Turner*, 2017 WL 3902931, at *7. The PCR court likewise determined that warrants were obtained for the murder scene and provided to Petitioner's trial counsel and noted that PCR counsel admitted the relevant warrants were obtained. *See* ECF No. 23, PCR opinion at 26-28. Petitioner has provided no evidence, let alone clear and convincing evidence, showing that that the relevant search warrants were not obtained. As such, his arguments that the search of the phones were warrantless is meritless, and he is unable to show that his counsel was deficient for failing to move to suppress the phone evidence or that he was prejudiced by that alleged error. The Court denies relief as to this claim in Ground Two.

### 4. Failure to Call Attention to a Sleeping Juror

Finally, Petitioner appears to contend that his attorney was ineffective for failing to call to the Court's attention a sleeping juror. In his PCR, Petitioner argued that his attorney was ineffective for failing to object to the excessive heat, *see* PCR Opinion at 11-13. In support of this argument, Petitioner pointed to a statement by Petitioner's counsel following his summation that he "must have put them to sleep," and a certification by his counsel stating that counsel remembered a juror falling asleep during his summation. *See* PCR Opinion at 11-12 (citing Certification of Robert E. Rogers dated Sept. 11, 2011 at ¶ 3). The PCR court found that

25

Petitioner failed to show either prong of *Strickland* with respect to his excessive heat IAC claim, *see id.*, and Petitioner did not raise this claim on appeal of the denial of PCR.

Although Petitioner's claim regarding the sleeping juror appears unexhausted, the Court will deny it as meritless. To establish that Petitioner's counsel was ineffective for failing to point out the sleeping juror, Petitioner's counsel relies on *State v. Mohammed*, 226 N.J. 71, 89 (2016), which was decided in 2016, long after Petitioner's trial. There, the New Jersey Supreme Court held that "going forward that the duty belongs to the court, as well as to counsel, to be certain that the defendant's trial is heard by an alert and attentive jury." To the extent *Mohammed* places the obligation on counsel to raise the issue of a sleeping juror to the court, Petitioner's trial and conviction predated *Mohammed* by almost a decade. As such, it is unclear how Petitioner's trial counsel could be deficient for failing to heed the obligation announced in *Mohammed*.[9]

Moreover, Petitioner has not shown his counsel was deficient, as counsel stated to the court that his summation must have put "them" to sleep. To the extent counsel was referring to a sleeping juror, he did notify the Trial Judge of the issue. The decision not to object or further question the juror could reasonably be a strategic one. *See, e.g., Ciaprazi v. Senkowski*, 151 F. App'x. 62, 63 (2d Cir. 2005) (summary order) (finding that "trial counsel's decision not to object [to a sleeping juror] may well have been based on his desire to retain the inattentive juror rather than to seek to replace him with an alternate").

---

[9] In *State v. Reevey*, 159 N.J. Super. 130, 133–135 (N.J. Super. App. Div. 1978), to which *Mohammed* cites, defense counsel informed the court that, during his summation, one of the jurors had been dozing, nodding, and sleeping. *Id.* at 133. Counsel suggested that the court designate the juror as an alternate but the court stated that it did not believe it had authority to do so. *Id.* The Appellate Division disagreed, stating that the court erred by failing to take "appropriate action [.]" *Id.* Petitioner's counsel does not argue that *Reevey* places an obligation on defense counsel to object to a sleeping juror under all circumstances, and the Court does not read the decision to impose that obligation.

In addition, Petitioner fails to show *Strickland* prejudice.  Petitioner provides insufficient evidence that the juror was actually sleeping during crucial portions of the summation, and counsel's certification is at best vague regarding whether the juror was actually asleep, for what length of time, and during what portion of the summation.  Nor does Petitioner provide any evidence to suggest that the sleeping juror affected the outcome of his trial in light of the strong evidence against him.  Thus, Petitioner fails to show he was prejudiced by his counsel's failure to object to the juror who was "falling asleep" during summation.  Relief as to this claim in Ground Two is denied on the merits for these reasons.

## IV.    <u>CERTIFICATE OF APPEALABILITY</u>

Having denied relief on Petitioner's habeas claims, the Court will also deny a COA. Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding unless he has "made a substantial showing of the denial of a constitutional right." Because Petitioner has not made a substantial showing of the denial of a constitutional right, the Court denies a COA.

## V.    <u>CONCLUSION</u>

As explained in this Opinion, the Court denies the Petition and denies a COA.  An appropriate Order follows.

/s/ Freda L. Wolfson
Freda L. Wolfson
U.S. Chief District Judge

DATED: March 30, 2022